**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

Robert M. Ryan,

Plaintiff,

v.

Case No. 4:15-cv-14085-TGB-App
Hon. Terrence G. Berg

Soave Enterprises LLC; the Executive Retirement Agreement, a pension plan sponsored by Soave Enterprises LLC; and Anthony Soave, the guarantor of the pension benefits under the Executive Retirement Agreement,

Defendants.

---

Eva T. Cantarella (P51917)
Robert P. Geller (P34391)
Steve J. Weiss (P32174)
Patricia A. Stamler (P35905)
Hertz Schram PC
1760 S. Telegraph Rd., Ste. 300
Bloomfield Hills, MI 48302
o. 248-335-5000; f. 248-3353346
ecantarella@hertzschram.com
*Attorneys for Plaintiff*

Thomas M. Fallucca
The Fallucca Law Firm, PLC
3400 E. Lafayette
Detroit, MI 48207
o. 313-567-7004
tomfallucca@falluccalaw.com
*Attorney for Defendants*

---

# PLAINTIFF ROBERT M. RYAN'S AMENDED COMPLAINT

Plaintiff Robert M. Ryan ("Ryan"), by and through his attorneys Hertz Schram PC, brings this Amended Complaint against Soave Enterprises, LLC ("Soave" or "Company"); the Executive Retirement Agreement, a pension plan sponsored by Soave ("the ERA" or "Agreement"); and Anthony Soave ("A. Soave"), the guarantor

of the pension benefits under the ERA.[1] In support of his Complaint, Ryan states the following:

**Jurisdiction and Venue**

1. This Court has jurisdiction over the parties pursuant to §§502(a), (e), and (f) of the Employee Retirement Income Security Act ("ERISA). 29 U.S.C. §§1132(a), (e), and (f).

2. Subject matter jurisdiction exists pursuant to 29 U.S.C. §1132(e)(1).

3. Venue is proper pursuant to 29 U.S.C. §1132(e)(2).

**Nature of the Claim**

4. This Complaint concerns Soave's stated intent to not pay Ryan the pension benefits he is due under the ERA when he attains age 62.

5. Ryan, who is currently age 60, seeks a declaration and order from this Court that (i) Soave must pay him the pension benefits specified under the ERA when he attains age 62, and (ii) if Soave fails to do so, A. Soave must pay the benefits, as A. Soave is the guarantor of those benefits.

**Parties**

6. Ryan was a participant in the ERA until June of 1999 when he ceased his employment with Soave, the sponsor of the ERA.

---

[1] Unless otherwise stated or defined herein, all capitalized terms shall have the meaning ascribed to them in the ERA (doc 1-2).

7. Soave is an affiliate of Soave Enterprises, Inc. (Soave and Soave Enterprises, collectively, "Soave") "a privately held, Detroit-based company with holdings in dozens of companies" that provide waste management, waste disposal, and scrap metal recycling services, including Ferrous Processing and Trading Company ("FPT"), one of our nation's largest recyclers of scrap metals, in particular, automobile scrap metals.

See http://www.soave.com/portfolio/ferrous-processing-trading/ and

http://www.fptscrap.com/about-ferrous-processing-trading/soave-enterprises/

8. Collectively, Soave's "portfolio of companies . . . generate annual sales in excess of $1.5 billion." Id.

9. A. Soave is the guarantor, under a separate Guaranty (doc 1-3), of the pension benefits due Ryan at age 62 under the ERA.

10. The ERA is a pension plan governed by ERISA because (A) it is "a plan, fund, or program" that was "established or maintained by an employer" [here, Soave] to "provide retirement income to employees" [here, Ryan and four other top-level Soave executives], 29 U.S.C. §1002(2)(A); and (B) ERISA preempts all state law claims that relate to employee benefit plans except plans exempted from ERISA's coverage under ERISA §4(b), which include governmental plans, church plans, certain workers' compensation, unemployment compensation and disability insurance

plans, and "excess benefit" plans. 29 U.S.C. §1144; and 29 U.S.C. §1003(b).[2]

11. More specifically, the ERA is an unfunded plan maintained by Soave "primarily for the purpose of providing deferred compensation [referred to as retirement benefits in the ERA] to a select group of management or highly compensated employees." 29 U.S.C. §1051(2).

12. Courts and pension plan practitioners typically refer to such plans as "Top Hat" plans.

13. While ERISA exempts Top Hat plans from its participation, vesting, funding, and fiduciary-duty provisions [See 29 U.S.C. §§1051 and 1081], it does not exempt Top Hat plans from ERISA's administration and enforcement provisions, including ERISA §502(a)(1)(B), which entitles participants to bring a civil action to recover benefits under the terms of their employer-provided plan, or to clarify their rights to such benefits in the future. See 29 U.S.C. §1101 (coverage) and §1132(a)(1)(B) (civil enforcement).[3]

---

[2] An excess benefit plan is a "plan maintained by an employer *solely* for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by section 415 of Title 26 [of the Internal Revenue Code ("IRC")]." 29 U.S.C. §1002(36) (emphasis added). The ERA nowhere suggests it was maintained *solely* (or even partly) to avoid the limitations on contributions and benefits imposed by IRC §415. Indeed, it does not mention IRC §415. Accordingly, the ERA is *not* an "excess benefit plan" as defined under ERISA §3(36), and therefore *is* subject to ERISA's coverage.

[3] By contrast, excess benefit plans *are* exempt from ERISA's administration and
(continued...)

14. Ryan's claim arises under the terms of the ERA, and he seeks a declaration as to his rights to the pension benefits thereunder when he turns age 62.

## Background

15. Ryan has been in the waste disposal and waste management business for over 35 years.

16. Ryan started in the business in late 1977 as a sales representative for Browning-Ferris Industries ("BFI"**),** a North American waste management company that was later purchased by Allied Waste, now known as Republic Services, one of the largest solid waste management companies in the nation with annual revenues of over $5 billion and assets of nearly $14 billion.

17. In 1981, Ryan became a co-owner in waste disposal companies Special Waste Systems and Best Way Recycling ("Best Way"), which subsequently acquired several other waste disposal companies, including Clarkston Disposal, Marine City Hauling, and Oakland Disposal.

18. In or about late 1990 or early 1991, due to the increasing costs of waste disposal resulting largely from a shortage of landfills at that time, Ryan and the other co-owners of Best Way decided to sell the company.

---

[3](...continued)
enforcement provisions. See 29 U.S.C. §1003(b). Therefore, it is important not to confuse a Top Hat plan with an excess benefit plan.

19. Best Way attracted prospective buyers because (i) it serviced a large share of the Southeast Michigan waste disposal market and had recently generated annual hauling revenues of $16 million and disposal revenues of $10 million, and (ii) held five (5)-year service contracts with all of its corporate and municipal customers that automatically renewed for additional five-year periods unless notice of cancellation was provided by certified mail at least 60 days before the end of the respective five-year period.

20. On or about August 15, 1991, Ryan and the other co-owners of Best Way accepted a purchase offer from City Management Corporation ("City Management"), a major waste hauling company then owned by Soave.

21. The transaction closed on February 15, 1992.

22. Because of Ryan's value to the business, City Management conditioned the acquisition on Ryan's agreement to work for City Management for five (5) years, commencing immediately after the closing.

23. Ryan soon became a major "rainmaker" for City Management, as he personally brought numerous significant accounts to City Management, including Chrysler, DTE, Detroit Public Schools, Guardian Glass (one of the world's largest manufacturers of fabricated glass products), Gallagher-Kaiser (builder of paint-booth systems for automobile manufacturers), Fritz Enterprise (a major scrap metal recycler), a lengthy renewal garbage-hauling contract with the City of Detroit, and the

Greater Detroit Resource Recovery Authority ("GDRRA," a waste management Authority for the City of Detroit's incinerator), which included City Management's purchase of GDRRA's tin cans at prices substantially below market.

24. Even before Ryan commenced his employment with City Management, specifically, during the six-month due diligence period before the acquisition, Ryan substantially increased the value of Best Way by convincing Canadian waste haulers to transport Canadian waste to U.S. landfills.

25. By the time City Management closed on the Best Way transaction, Best Way was generating hundreds of thousands of dollars per month in new revenues from Canadian waste.

26. In 1989, Ryan met Jeff Cole ("Cole"), the owner of FPT.

27. Cole told Ryan that, as part of its scrap metal business, FPT shredded cars and that approximately 25% of the shredded material consisted of foam, leather, and other "fluff" FPT could not recycle, but of which FPT needed to dispose.

28. Cole inquired if City Management could dispose of the fluff.

29. City Management's legal department believed City Management could not accept the fluff for disposal in landfills.

30. While researching the pertinent regulations, Ryan learned that the Department of Environmental Quality ("DEQ") believed the fluff was acceptable for covering the "type-2" landfills owned by City Management, and, therefore, City

Management *could* accept the fluff.

31. As a result, City Management acquired not only FPT's business for disposal of its fluff, but, by 1995, had entered into fluff disposal contracts with nearly every other scrap yard in Southeast Michigan.

32. FPT's business, including the new fluff disposal contracts, increased City Management's yearly net profits by millions of dollars.

33. Ryan's immersion and success in the scrap metal business during the ensuing years convinced him that City Management could further increase its profitability by partnering with FPT in building a new state-of-the art scrap yard on Strong Street in Detroit.

34. Ryan pitched this idea to A. Soave and others at Soave and, soon thereafter, City Management became a 50/50 partner with FPT in its scrap metal business, a transaction that significantly increased City Management's revenues.

35. Not long after City Management's acquisition of its 50% interest in FPT, City Management purchased the 50% interest held by Cole.

36. Ryan's visionary, entrepreneurial, and rain-making skills irrefutably contributed to the growth of City Management's business and consequent increase in value, and enabled Soave to sell the company in early 1998 for $750 million to U.S.A. Waste, Inc., which later that year merged with and became known as Waste Management, Inc. (collectively, "Waste Management"), a large multi-national waste

disposal company.

37. Soave, however, retained its scrap metal holdings and, by 1999, had acquired most of the major scrap yards in Detroit, Cleveland, Windsor, and Miami.

38. Soave now owns the fourth largest scrap metal company in the world, FPT, worth close to $1 billion.

39. Ryan continued to work for Soave after it sold City Management in 1998.

40. Later that same year, Ryan conceived a new money-making waste disposal business model: form a company to enter into contracts with businesses that needed a variety of waste management services and then provide *all* of those waste management services, including, as required, solid hazardous and non-hazardous waste and liquid waste disposal, medical waste disposal, industrial environmental cleaning waste disposal (e.g., asbestos), and “universal” waste transportation and disposal (e.g., light bulbs, batteries, and electronic equipment).

41. Significantly, the company would not acquire its own haulers to perform this work (except for some containers and compactors), but would, instead, outsource the work to third parties.

42. Ryan presented his idea to A. Soave and two other Soave executives--Michael Piesko (“Piesko”), then Soave’s CFO, and Yale Levin (“Levin”), Soave’s Executive Vice President.

43. Ultimately, A. Soave became a 50% silent co-member with Ryan in Disposal Management, L.L.C. ("Disposal Management"), a company Ryan formed on April 7, 1999 that employed the new business model Ryan had proposed.

44. Levin conducted monthly reviews of Disposal Management's financial records and spoke to Ryan daily about Disposal Management's business to ensure that A. Soave received his share of any profits resulting from the operations of the company.

45. Disposal Management struggled financially during the two years following A. Soave's procurement of his silent 50% membership interest.

46. These financial difficulties were largely, if not almost solely, caused by (i) the fact that A. Soave, through Levin, insisted that Disposal Management use PMDS, a company owned by Soave, to perform its bookkeeping and dispatch services (one person taking phone calls), (ii) PMDS's exorbitant charges to Disposal Management for these services, which initially approximated $40,000 per month, but rapidly increased to approximately $75,000 per month, and (iii) Levin's insistence that Disposal Management grant Soave significantly reduced rates on trash hauling and shredder fluff services that Disposal Management performed for Soave.

47. As a result, Disposal Management was unable to turn a profit and had to borrow heavily to stay afloat.

48. Ryan and his ex-wife Sheryl Ryan personally signed for this debt and, in addition, were required to collateralize it with their own personal assets.

49. Ryan also informed Levin that he intended to dispense with PMDS's services and, instead, hire an in-house personnel to handle Disposal Management's bookkeeping and dispatch services for far less than the exorbitant fees PMDS had been charging.

50. In view of Disposal Management's heavy debt load and Ryan's decision to dispense with PMDS's services, services that had been A. Soave's source of income from the company, A. Soave sought to disassociate from Disposal Management.

51. Therefore, in late 2001, Levin notified Ryan that A. Soave wanted to withdraw from Disposal Management and relinquish his membership interest.

52. In early 2002, Ryan and A. Soave mutually agreed that A. Soave would withdraw from Disposal Management and relinquish his membership interest, and A. Soave's relationship with Disposal Management, in fact, ended at that time.

53. Ryan then hired for Disposal Management a bookkeeper and a dispatcher for a total cost of approximately $5,500 per month (approximately $3,500 per month for the bookkeeper, and approximately $2,000 per month for the dispatcher).

54. Nonetheless, for the next few months, Disposal Management continued to struggle and Ryan feared losing the business.

55. However, in or about June of 2002, Ryan secured for Disposal Management a lucrative sludge contract with the City of Detroit.

56. As a result, Disposal Management finally became profitable.

57. When A. Soave learned that Ryan had secured the sludge contract with the City of Detroit, he demanded, through Levin, to again be a 50% silent member of Disposal Management.

58. Ryan told Levin that he would consider the demand only if A. Soave would pay the fair market value ("FMV") for such 50% membership.

59. A. Soave was unwilling to pay the FMV for a 50% membership interest in Disposal Management, but nonetheless continued for several more years to demand, through Levin, that he receive a 50% membership interest in Disposal Management.

**Ryan's ERA Benefits**

60. In late February or early March of 1999, while Ryan was still employed by Soave (then as a Vice President of the Company), Piesko presented Ryan with the ERA, which was dated February 26, 1999 and named Soave as the provider of the retirement benefits specified therein.

61. At the time Piesko presented the ERA to Ryan, Soave had already signed it.

62. Piesko asked Ryan to sign the ERA, as well, and then gave him an original or copy of the ERA.

63. Contrary to Defendants' representations in the parties' Joint Discovery Plan–

A. There was no agreement between Ryan and A. Soave or anyone else at Soave, that A. Soave would receive a 50%membership interest in Disposal Management and, in exchange, A. Soave would provide Ryan with the ERA. In fact, <u>the ERA nowhere indicates that it was provided in exchange for A. Soave receiving a 50% membership interest in Disposal Management</u>.

B. Quite the opposite: A. Soave did not want a writing issuing to him a 50% membership interest in Disposal Management <u>because he had signed a five-year non-compete with Waste Management</u> and such an issuance would violate the non-compete and potentially invite an expensive lawsuit and considerable liability upon A. Soave.

C For this same reason, Ryan was never told that the ERA would have no validity unless and until he signed an Operating Agreement issuing such membership interest to A. Soave in Disposal Management.

D. Further, Ryan never went "behind" A. Soave's or Levin's "back" to obtain the ERA, and never requested it from Piesko; rather, Piesko presented the ERA to Ryan and without any conditions.

64. However, Levin presented Ryan with a draft proposed Operating Agreement that, while not issuing a membership interest to A. Soave in Disposal Management at that time, granted A. Soave the right to purchase all of Disposal Management's outstanding membership interests at any time for $10,000! The document did not mention the ERA.

65. Ryan thought the draft proposed Operating Agreement was ludicrous and, therefore, made a counter proposal, but A. Soave promptly rejected it and that was the end of the matter.

66. On the same date Piesko presented the ERA to Ryan, he presented a virtually identical ERA to himself and three other Soave Executives: Peter Saputo (then Soave's Executive Vice President, but no longer with the Company), Levin (still with the Company), and Kathleen McCann (then a Vice President of Soave, but no longer with the Company).

67. Ryan and the other four Executives who received the ERA were sometimes collectively referred to in various documents by the first letter of their first names, PYMRK (discussed below).

68. At its outset, the ERA expressly states that the Executive [Ryan] "has provided many years of dedicated service to affiliates of the Company, each of which is owned by Anthony Soave [i.e., A. Soave]." ERA at p1 (doc 1-2).

69. The ERA then explains that Soave desires to provide the Executive with retirement benefits, and that these benefits commence on the first of the month following the Executive's attainment of age 62 or the date he/she ceases to provide employment services to Soave or any of its Affiliates, whichever is later. ERA at p1 and §1(D) (doc 1-2).

70. In June of 1999, realizing that he needed to devote his full-time attention to Disposal Management to ensure its success, Ryan voluntarily ceased providing employment services to Soave and its Affiliates.

71. Thus, as mandated by the ERA, Ryan's benefits commence on the first of the month following his attainment of age 62 (i.e., on 5/1/2017) and continue to be paid on the first day of each calendar month thereafter for the remainder of his life. Following Ryan's death, the ERA must pay the benefits to Ryan's surviving spouse, if any, for the rest of her life. ERA at §1(D) and §2 (doc 1-2).

72. The monthly ERA benefit, denoted the "Accrued Benefit," is extremely valuable, but then so were Ryan's employment services to Soave and its Affiliates.

73. More specifically, the monthly Accrued Benefit equals one-twelfth of an amount that is sixty-five percent (65%) of the Executive's "Average Annual Compensation," adjusted upward on an annual basis for increases in the "Index" occurring after the "Applicable Beginning Date" [the date Ryan's benefits are scheduled to commence], but subject to a maximum benefit amount set forth in §3 of the ERA. See ERA at §1(A) (doc 1-2).

74. "Average Annual Compensation" is defined in the ERA as the average Annual Compensation the Executive received from Soave and any Affiliate of Soave for the five (5) calendar years during which the Executive's Annual Compensation was highest out of the ten (10) consecutive calendar years preceding the calendar year in which the Executive ceased to perform employment services for Soave and its Affiliates. ERA at §1(E) (doc 1-2).

75. "Index" is defined as the Revised Consumers' Price Index for Urban Wage Earners and Clerical Workers for the Detroit Area, published by the Bureau of Labor Statistics of the United States Department of Labor. ERA at §1(G) (doc 1-2).

76. Exhibit A to the ERA lists Ryan's Annual Compensation for the five years 1994 through 1998, which represented his five (5) highest years of compensation while employed by Soave or an Affiliate of Soave

77. Based on those amounts, Ryan's Average Annual Compensation for this five-year period was $315,000.

78. Sixty-five percent (65%) of this amount equals $204,750.00 annually, or $17,062.50 per month at age 62.

79. Pursuant to §1(A) of the ERA, this annual amount will increase each year based on increases in the Index, such that, after 20 years Ryan's monthly Accrued Benefit is expected to exceed $30,000 per month, or $360,000 per year.

80. Ryan's Accrued Benefit under the Plan is an especially valuable benefit--one that *any* Executive would covet and not readily forfeit.

81. Moreover, §8 of the Plan prohibits any voluntary or involuntary alienation, sale, transfer, pledge or assignment of the retirement benefits thereunder. ERA at §8 (doc 1-2).

82. And §14 of the ERA adds that the "provisions of this Agreement may be amended or waived only with the prior written consent of the Company [Soave] and the Executive [Ryan] . . .." ERA at §14 (doc 1-2).

83. Therefore, any escape from the "provisions" of the ERA requires the prior *written* consent of *both* Soave and Ryan.

84. In the ERA, A. Soave was the signatory for Soave, and Ryan was the signatory for the Executive. ERA at p6 (doc 1-2).

85. Lastly, the ERA contains a merger and integration paragraph, which states that the ERA overrides any prior understandings, agreements, or representations by or among the parties:

> Complete Agreement. This Agreement comprises the complete agreement and understanding among the parties and supersedes and preempts any prior understandings, agreements, or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

ERA at §15 (doc 1-2).

86. Absent from the ERA is any provision conditioning Ryan's entitlement to the ERA benefits on the issuance to A. Soave of a membership interest in Disposal Management.

87. On the contrary, to ensure that Ryan *would* receive his ERA benefits, on the same date Piesko presented Ryan with the ERA, he also presented Ryan with A. Soave's personal written Guaranty (doc 1-3), guaranteeing Ryan that the benefits *would* be paid.

88. The Guaranty states that it is expressly made by A. Soave "for the benefit" of Ryan and his spouse. See doc 1-3.

89. This language is then immediately followed by Recitals, which note that the Plan provides retirement benefits to Ryan at age 62, and that, to induce Ryan to provide "continued service" to Soave, A. Soave has guaranteed the payment of the benefits. Id.

90. Paragraph 1 of the Guaranty "unconditionally" guarantees payment of the ERA benefits "when due." Id.

91. Paragraph 3 states that the Guarantor's liability for payment of the benefits is "absolute and unconditional," and that "nothing except final and full payment to Executive of all Benefits shall operate to discharge Guarantor's liability under the Guaranty." Id.

92. Paragraph 3 adds that the "Guarantor unconditionally and irrevocably waives each and every defense which under principles of guaranty or suretyship law would otherwise operate to impair or diminish the liability of Guarantor for the Benefits" (emphasis added). Id.

93. Paragraph 4 similarly states that the Guarantor "unconditionally and irrevocably waives . . . any defenses related to the validity or enforceability of any documentation executed by the Company or by Guarantor in connection with payment of the Benefits." Id.

94. The Guaranty was signed by both A. Soave as Guarantor and Ryan as Executive.

95. Given that the ERA prohibits alienation of the retirement benefits [ERA at §8] and permits amendment or waiver of its provisions only with the prior *written* consent of *both* Soave and Ryan [ERA at §14], and that the Guaranty waives all defenses to payment of the benefits, Ryan believed his retirement benefits under the ERA were secure.

96. Accordingly, even after Ryan left Soave's employment in June of 1999 to devote his full-time attention to Disposal Management, and even after he and A. Soave severed their business relationship in Disposal Management in early 2002, Ryan and A. Soave remained on friendly terms and continued to do business with each other.

97. The following are just a few of many such business dealings:

A. From 2003 until 2009, Disposal Management and MPS (a waste disposal company co-owned by A. Soave) worked together on waste disposal contracts for Chrysler's Warren Stamping Plant and Jefferson North Assembly Plant.

B. From 1996 until 2003, Ryan and A. Soave were partners in PYMRK Popstraw Partnership, a partnership organized to invest in a patented process whereby straws would pop out of beverage cans and bottles when one was ready to drink the beverage.

C. From 1996 until 2008, Ryan and A. Soave partnered in PYMRK Greenwich Partnership, a partnership organized to invest in CDs and various other investment vehicles.

D. From 2004 until 2007, Ryan, <u>without any remuneration from Soave</u>, attended numerous meetings with Russ Young (Chrysler's Director of Purchasing) and Craig Carrington (a Chrysler Vice President) for the purpose of securing Chrysler's scrap metal for Soave.

E. In 2007, Ryan, <u>again without any remuneration from Soave</u>, made numerous trips to Kendal County, Illinois with Levin to obtain the signatures of waste haulers who would state that they could provide a specified number of tons of waste for disposal in a proposed landfill in the County that Soave would operate on land already owned by Soave and, therefore, they believed the landfill was needed.

**The Divorce**

98. In March of 2005, Ryan and his wife Sheryl Ryan divorced.

99. Ryan did not want the divorce and was extremely distraught during the months prior to finalization of the divorce.

100. Ryan's insulin-requiring diabetes also worsened due to the stress of the divorce, leading to frequent cycles of high blood sugar, responsive injections of substantial insulin, and consequent low blood sugar, causing Ryan to experience sudden mood swings, nervousness, extreme fatigue, headaches, incoherence, and, on a few occasions, loss of consciousness.

101. Given his diminished capacity to think or reason, Ryan's business and personal affairs suffered.

102. Indeed, although Ryan retained counsel early on to represent him in the divorce proceedings, he eventually terminated the representation and elected to represent himself.

*103. Ryan's diminished capacity quickly became apparent to A. Soave and others at Soave because Levin and Ryan spoke at least once a week after Ryan left Soave's employment about various business activities in which Ryan was engaged on behalf of A. Soave and Soave, including those outlined in paragraph 97, above.

104. Approximately one month before the divorce, Levin called Ryan and conveyed A. Soave's concerns that Ryan's erratic behavior jeopardized Disposal Management's business, and that A. Soave worried he would become responsible for Disposal Management's obligations in light of his prior relationship with the company.

105. Through Levin, A. Soave requested that Ryan release him from any responsibility for such obligations.

106. Ryan took A. Soave's concerns and worries seriously and informed Levin he would "think about" acceding to A. Soave's request.

107. A few weeks later, on March 2, 2005, after several more calls from Levin about the requested release, Ryan informed Levin during a telephone call that he would sign a written release because he valued his relationship with A. Soave and wanted to ensure it would remain intact.

108. Ryan and Levin then agreed to meet post haste in the men's locker room at the Oakland Hills Country Club.

109. In less than an hour, Levin appeared in the men's locker room with a half-page General Release (the "Release") in hand, which Ryan promptly signed. <u>Neither prior to nor during Levin's visit to the men's locker room did Levin or anyone else on behalf of Soave or A. Soave suggest or intimate that the Release would encompass the ERA, and the Release omitted any reference to the ERA</u>. <u>See</u>

doc 1-4.

110. Ryan did not receive a copy of the executed Release when he signed it and, in fact, forgot about the Release until recently when Soave's attorney, Thomas Fallucca ("Fallucca"), produced it and advised that Ryan was not entitled to any of the ERA benefits.

**The Release**

111. Even a cursory review of the Release confirms that Ryan did not release Soave or A. Soave of their obligations to pay the ERA benefits when Ryan attains age 62.

112. As discussed, the Release nowhere mentions the ERA. See Release (doc 1-4).

113. Obviously, if the intent had been to release Soave or A. Soave of their obligations to pay the ERA benefits, the Release would have expressly so stated.

114. Furthermore, a Stipulated Order Assigning Interest in Executive Retirement Benefit ("Stipulated Order"), dated May 20, 2005 (18 days after Ryan's execution of the Release), assigned to Sheryl Ryan [Ryan's now ex-wife] a 50% interest in the ERA benefits.

115. Sheryl Ryan's divorce attorney, Harriet Rotter ("Rotter"), had this Stipulated Order hand-delivered to Levin on June 6, 2005, as memorialized in a notarized Proof of Service filed with the Oakland County Circuit Court on June 20,

2005.

116. Thereafter, Rotter never received any communication from Levin, A. Soave, or anyone else at, or on behalf of, Soave or A. Soave, asserting that Ryan had released Soave and A. Soave from their obligations to pay the ERA benefits upon Ryan's attainment of age 62, further evidencing that Ryan did *not* release those obligations.

117. Moreover, the Release is not mutual, as neither A. Soave nor Soave released any claims they might possess against Ryan, and there was no other consideration for the Release, as the purported consideration--"a loan or loan commitment to the undersigned [Ryan] in the amount of up to $1,500,000 from MDN Financial, Inc, a Michigan Company" ("MDN") (emphasis added)–is no consideration for *anything* much less the absolute relinquishment of rights to a valuable pension benefit worth several multiples of the maximum "up to" loan amount.

118. As an initial matter, MDN did not exist at the time, does not exist, and has never existed.

119. Not surprisingly, Ryan never received a loan or loan commitment from MDN.

120. However, even if MDN had existed when Ryan signed the Release, MDN's obligation under the Release was patently illusory, as a loan or loan commitment "up to" $1,500,000 means the loan could be for a dime, nickel, or penny–amounts that are clearly inadequate to relinquish a pension worth millions of dollars, especially given that (i) Ryan's initial pension amount is over $204,000/year, (ii) at age 62 Ryan is expected to live another 20 years,[4] and (iii) Ryan's pension will increase each year in tandem with the Index.

121. In addition to being illusory, the MDN loan or loan commitment proffered in the Release is void for vagueness, as it lacks any of the essential terms of an enforceable loan or loan commitment. For example, the proffered loan or loan commitment fails to state–

(i) when the loan or loan commitment will be made (today?, tomorrow? ten years from now?),

(ii) the interest rate and whether it will be fixed or adjustable,

(iii) whether payments must be made monthly, bi-monthly, or on some other schedule,

(iv) the periodic payment amount,

(v) the length of the loan,

(vi) the payoff date, or

---

[4] See http://www.ssa.gov/oact/STATS/table4c6.html

(vii) the collateral, if any.

122. After Plaintiff's counsel explained to Fallucca that the consideration stated in the Release was purely illusory and void for consideration, Fallucca emailed Plaintiff's counsel a purported loan commitment from MDH Financial, Inc. ("MDH") that was supposedly signed by Ryan.

123. It is undisputed that Ryan never received a loan from MDH.

124. As noted, the Release calls for the loan or loan commitment to come from MDN (a non-existent company), not MDH, a company that holds itself out to the State of Michigan as a financial consulting company, not a lending entity.

125. Prior to its production, Ryan never saw the purported loan commitment from MDH and vehemently denies signing the document.

126. Moreover, contrary to Defendants' representations in the Joint Discovery Plan, although Ryan was going through a divorce at the time, he did not need a loan in order to resolve a division of property between himself and his now ex-wife Sheryl Ryan.

127. Ryan believes the signature on the purported loan commitment was copied from one of the numerous documents he signed while at Soave, as he did not sign the purported loan commitment.

128. Therefore, Plaintiff's counsel requested that Fallucca produce an original of the purported loan commitment, but Fallucca never did so.

129. The purported loan *commitment* from MDH was, in fact, only a loan *proposal*. See page 3 of the purported loan commitment from MDH (hereafter, "Loan Proposal," doc 1-5).

130. The Loan Proposal is dated April 28, 2005, directed to Ryan, and signed by Michael D. Hollerbach, President of MDH (doc 1-5).

131. Page 3 of the Loan Proposal makes clear that it is only a loan proposal and that it would not become a loan commitment unless Ryan signed it and returned an original of it to MDH by May 3, 2005:

> If the foregoing terms and conditions are satisfactory, please indicate acceptance of this proposal by signing and returning an original of this letter on or before May 3, 2005. This proposal will expire if not accepted and received by us by such date . . .

Loan Proposal at p3 (doc 1-5) (emphasis added).

132. In their Answer to the Complaint, Defendants admit they do not possess an original of the Loan Proposal purportedly signed by Ryan, and suggest that Ryan has it (Answer at ¶115).

133. However, Ryan never signed the Loan Proposal. So, he plainly does not have any such "original."

134. But, even if Ryan *had* signed the Loan Proposal from MDH and returned an original of it to MDH by May 3, 2005, that would not constitute the consideration stated in the Release, which is a loan or loan commitment from MDN.

135. It is undisputed that Ryan did not provide a signed original of the Loan Proposal to MDH because Defendants allege in their Answer that Ryan kept the original in his possession (Answer at ¶115). Therefore, even if Ryan had signed the Loan Proposal from MDH, and even if the consideration stated in the Release was a loan commitment from MDH, rather than a loan commitment from MDN, that document would not be a loan commitment from MDH because MDH did not receive the original, much less by May 3, 2005.

136. Additionally, the Loan Proposal from MDH is not conditioned upon Ryan signing a release, much less *the* Release.

137. Likewise, the Loan Proposal from MDH nowhere references the Release, and the Release nowhere references MDH.

138. Clearly, the Loan Proposal from MDH did not indicate that it was tied to the Release, or that Ryan waived his rights to the ERA benefits.

139. Rather, as noted, the Release references a loan or loan commitment from MDN, not a Loan Proposal, much less one from MDH.

140. Therefore, even if the Release *had* included the essential terms of a $1.5 million loan commitment from MDN, the Loan Proposal from MDH would not show that Ryan received that consideration.

141. Finally, the Loan Proposal from MDH contemplated an amount that was only "equal to" the balance on the mortgage on Ryan's home in Bloomfield Hills, MI (about $1.2 million at that time), a mortgage with more favorable terms than the MDH Loan Proposal and which continued to exist until recently when Ryan sold the home.

142. Therefore, the Loan Proposal from MDH offered Ryan nothing of any value, much less terms and conditions that would induce him to forfeit pension benefits worth several multiples to myriad multiples of the range of possible loan amounts.

143. As earlier noted, pursuant to §14 of the ERA Plan, its provisions "may be amended or waived only with the prior written consent of the Company and the Executive" (emphasis added); that is, with the prior written consent of both Soave and Ryan. See doc 1-2.

144. Although Ryan signed the Release, there is no signature on the Release purporting to be on behalf of Soave, only the signatures of Levin and a Suzanne C. Wallace purporting to witness Ryan's signature.

145. Thus, the Release does not bear Soave's written consent.

146. Furthermore, Ryan has never met Suzanne Wallace, and she most definitely was not in the mens locker room when Ryan signed the Release.

147. Not surprisingly, the mens locker room was and is off limits to women except on those rare occasions when some necessity requires a female Oakland Hills employee to bring something into the mens locker room.

148. Therefore, although Wallace signed and notarized the Release as a witness to Ryan's signature, she did not, in fact, see Ryan sign the Release *because she was not there*.

149. For all or any of these reasons, Ryan never released Soave or A. Soave from their obligations to pay the ERA benefits.

**Exhaustion and Futility**

150. The courts in the Sixth Circuit require that claimants of ERISA benefits exhaust their administrative remedies under the plan, or show that such exhaustion would be futile, before seeking judicial relief.

151. The ERA does not provide a claims procedures or any other administrative avenue for seeking benefits or a declaration as to one's rights to benefits under the ERA.

152. Soave attorney Fallucca maintained on several occasions in November and December of 2014 that the Release negated Ryan's entitlement to benefits under the ERA.

153. Ryan also tried to resolve the dispute via direct communications with Levin, but Levin told Ryan the same thing--that he was not entitled to benefits under the ERA.

154. It follows that Ryan's claim, which seeks a declaration from this Court that he *is* entitled to the ERA benefits at age 62, is ripe for adjudication.

**Count I - Claim for ERA Benefits Commencing at Age 62**

155. Ryan realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully restated herein.

156. Pursuant to ERISA §502(a)(1)(B), a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §1132(a)(1)(B).

157. Ryan seeks a declaration under the third clause that he is entitled to the ERA benefits, commencing on the first of the month following his attainment of age 62.

158. For the reasons set forth above, Ryan is unquestionably entitled to those benefits.

Wherefore, Ryan requests that this Court–

(i) declare that the Release is unenforceable as a matter of law;

(ii) declare that Ryan is entitled to the pension benefits under the ERA, commencing on the first of the month following his attainment of age 62;

(iii) declare that A. Soave is the guarantor of those ERA benefits;

(iv) order Soave to pay Ryan the ERA benefits, commencing on the first of the month following his attainment of age 62;

(v) order A. Soave to pay these benefits in the event Soave fails to do so;

(vi) order Soave to pay all costs and attorneys' fees incurred in prosecuting this action, as permitted under ERISA §502(g), 29 U.S.C. §1132(g);

(vii) order A. Soave to pay these costs and attorneys' fees in the event Soave fails to do so;

(viii) order any other relief that is appropriate and permissible under ERISA §502(a), including equitable relief under ERISA §502(a)(3).

Respectfully filed January 28, 2016

s/s Eva T. Cantarella
Hertz Schram PC
By: Eva T. Cantarella (P51917)
Robert P. Geller (P34391)
Steve J. Weiss (P32174)
Patricia A. Stamler (P35905)
*Attorneys for Plaintiff*
1760 S. Telegraph Rd., Ste. 300
Bloomfield Hills, MI 48302
o. 248-335-5000; f. 248-335-3346
ecantarella@hertzschram.com

**CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2016, I served a copy of (i) Plaintiff Robert M. Ryan's Amended Complaint, and (ii) this Certificate of Service upon the following attorney for Defendants via the Court's CM/ECF system.

Thomas M. Fallucca
The Fallucca Law Firm, PLC
3400 E. Lafayette
Detroit, MI 48207
o. 313-567-7004
tomfallucca@falluccalaw.com
*Attorney for Defendants*

/s/ Eva T. Cantarella
Eva T. Cantarella
ecantarella@hertzschram.com